**Elizabeth MAY, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**No. 84–C–226–D.**

United States District Court, W.D. Wisconsin.

April 30, 1985.

Margaret Stafford, of Stafford & Neal, Madison, Wis., for plaintiff.

John R. Byrnes, U.S. Atty., Madison, Wis., for defendant.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

Plaintiff brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), seeking a review of a final decision of the defendant Secretary. The Secretary determined that plaintiff was ineligible both for disability insurance benefits under sections 216(i) and 223 of the Social Security Act, as amended, 42 U.S.C. §§ 416(i) and 423, and for supplemental security income (SSI) benefits under section 1614(a)(3)(A) of the Social Security Act, 42 U.S.C. § 1382c(a)(3)(A). In accordance with the provisions of 42 U.S.C. § 405(g), the Secretary has filed a certified copy of the administrative record transcript.

## OVERVIEW OF THE RECORD

### 1. *Procedural History*

On July 30, 1982, Elizabeth May filed applications with the Social Security Administration for disability insurance and supplemental security income benefits; she alleged that she had been unable to work since August 25, 1980, due to her paranoid schizophrenia. (Tr. 50–63) These applications were denied by the Social Security Administration in notices dated September 10, 1982. (Tr. 64–68) On November 4, 1982, plaintiff sought reconsideration of the denials. (Tr. 69) On January 14, 1983, the Secretary determined that plaintiff was not entitled to receive disability insurance or supplemental security income benefits. (Tr. 70–74)

Pursuant to plaintiff's timely request, a hearing was held before an administrative law judge (ALJ) on June 13, 1983. Plaintiff appeared with a non-attorney representative and was the sole witness at the proceeding, which lasted approximately one hour. (Tr. 22–39) On September 26, 1983, the ALJ issued her decision denying disability insurance and supplemental security income benefits. (Tr. 11–15) On December 16, 1983, plaintiff's non-attorney representative wrote to the Appeals Council, requesting reversal of the ALJ's decision or remand. (Tr. 7–9) On December 30, 1983, plaintiff filed a request for review of the ALJ's decision. (Tr. 6) The Appeals Council denied plaintiff's request on January 25, 1984. (Tr. 4–5) Accordingly, the ALJ's decision became the final decision of the Secretary.

Plaintiff commenced the present action on March 15, 1984. In the complaint and in a motion dated July 6, 1984, plaintiff seeks an order reversing the Secretary's decision or, alternatively, vacating the decision and remanding the case to the Secretary for a new hearing. Plaintiff also requests reasonable costs and disbursements. Plaintiff contends that the Secretary's decision was arbitrary, capricious, not supported by substantial evidence, and premised on errors of law. Defendant seeks an order affirming the Secretary's decision.

### 2. *Medical Evidence*

Plaintiff was born on October 1, 1937 (Tr. 15) and at the time of the administrative hearing was forty-five years old. (Tr. 26) She is a high school graduate (Tr. 27) and her past relevant work history consists of positions as waitress, assistant manager, and manager at various restaurants. (Tr. 28–31) Plaintiff completed an eight-week homemaker health care aide course on June

10, 1983, at Madison Area Technical College, a vocational school. (Tr. 27)

The record contains a number of medical reports of the diagnosis, treatments and prognoses of plaintiff's mental and physical impairments. Described in chronological order, the following reports summarize the medical evidence of record.

On November 18, 1980, plaintiff was examined at the University of Wisconsin Hospital and was diagnosed as having musculoskeletal chest wall pain. (Tr. 143)

On March 18, 1981, Kenneth H. Rusch, M.D., board-certified psychiatrist, saw plaintiff and filed an extensive report of their session. (Tr. 144–147) Plaintiff told Dr. Rusch of her "long history of treatment for repeated episodes of mental illness,"[1] which included nine nervous breakdowns, electroconvulsive therapy, numerous suicide attempts, failed marriages, spousal abuse, repeated hospitalizations for psychiatric care and for treatment of complications resulting from a hysterectomy, and long-term use of prescribed tranquilizers. (Tr. 144–145) Plaintiff stated that in spring of 1980 she experienced a "crisis" of extreme paranoia, at which time she went to the Dane County Mental Health Center and was prescribed increased doses of medication. Subsequently, plaintiff left her employment as manager of a hotel restaurant, secured another job at a fast food restaurant, and finally left that position a few weeks before her examination by Dr. Rusch. (Tr. 145–146)

Dr. Rusch observed that plaintiff was "cooperative and generally appeared in good spirits, except when discussing her father, when she wept." (Tr. 146) Dr. Rusch further noted that plaintiff showed no signs of depression or suicidal thinking at their session, but that "[s]he did display a somewhat confused manner and expressed some religious preoccupations, as well as what appeared to be paranoid thinking concerning her first husband." (Tr. 146) Specifically, plaintiff claimed to Dr. Rusch during their session that her first husband had been in the Mafia; she called Dr. Rusch later that day to request that he change his report to state that her first husband had been "a communist or a Nazi." (Tr. 146) The next day, plaintiff brought Dr. Rusch a note in which "she continued to express considerable paranoid thinking and also spoke in a rather disorganized way about God's plan." (Tr. 147) Dr. Rusch noted that she was well-oriented and apparently of average intelligence, but that she suffered from impaired judgment and a lack of insight. (Tr. 147)

Dr. Rusch diagnosed plaintiff's condition as chronic[2] paranoid schizophrenia,[3] which "appeared to be decompensating[4] into acute psychotic symptomatology."[5] Plaintiff told Dr. Rusch that she felt unable to handle work pressures. Dr. Rusch concluded:

Despite the fact that she has had multiple psychiatric hospitalizations, apparently she has been able to work in fairly responsible positions. For this reason I would estimate the prognosis would be fair if she cooperates with psychiatric treatment.

(Tr. 147)

In a report dated March 25, 1981, Leonard Stein, M.D., board-certified specialist in

---

1. Dr. Rusch's report noted that plaintiff "appeared to be a reliable informant, although there is no corroborating information." (Tr. 146)

2. "Chronic" is defined as "persisting over a long period of time." *Dorland's Illustrated Medical Dictionary* 316 (25th ed. 1974).

3. "Paranoid schizophrenia" is defined as "a psychotic state characterized by delusions of grandeur or persecution, often accompanied by hallucinations." *Id.* at 1386.

4. "Decompensate" is defined as "to suffer loss of ability to maintain normal or appropriate compensatory mechanisms." *Random House College Dictionary* 345 (revised ed. 1980).

5. "Psychosis" is defined as "a general term for any major mental disorder of organic and/or emotional origin characterized by derangement of the personality and loss of contact with reality, often with delusions, hallucinations, or illusions." *Dorland's Illustrated Medical Dictionary* at 1283.

"Symptomatology" is defined as "the combined symptoms of a disease." *Id.* at 1513.

psychiatry and neurology, stated that plaintiff had been admitted that day to the Methodist Hospital in Madison, Wisconsin for treatment of a recurring schizophrenic episode. Dr. Stein noted that plaintiff's symptoms of auditory hallucinations and paranoid thinking had been caught at an early stage, and that appropriate medication had been prescribed to stabilize her condition. Finally, Dr. Stein prescribed continued medication and outpatient follow-up, and diagnosed plaintiff's condition upon discharge as "paranoid-type schizophrenia in remission." [6] (Tr. 148)

On March 26, 1981, Dr. Stein and Ms. Marilyn Holschuh-Peetz, plaintiff's psychiatric social worker, wrote to the Bureau of Social Security Disability Insurance regarding plaintiff's condition. The letter stated: "[W]ithin the past year, her ability to function has decreased markedly, even with the continued use of medication. She has not been able to maintain employment successfully in the past few months and is currently unemployed. Her symptomatology of paranoid thinking, labile affect, inability to concentrate, and sleeplessness have increased markedly." The report concluded that plaintiff had tried unsuccessfully to cope with her increasing deterioration, and that "her application for disability is perceived as a last resort, but a necessary decision." (Tr. 178)

On March 31, 1981, Dr. Stein filed a more extensive report of plaintiff's psychiatric history, social history, mental status, and prognosis. (Tr. 149–150) He noted that plaintiff had been "doing well" until approximately three months before her March 1981 hospitalization, when she had begun to suffer a "slow, definite downward drift in her psychological state." (Tr. 149) During the three-month period, plaintiff had begun to experience difficulty with sleep, auditory hallucinations, feelings of depression and fear, sufficient anxiety to quit her job, and other symptoms "severe enough to warrant inpatient admission." (Tr. 149) Dr. Stein stated that since 1975 he had helped plaintiff through several psychotic episodes and had stabilized her condition by prescribing Stelazine and Cogentin.[7] He also noted that hospitalization had not been necessary in the past, primarily because plaintiff had been "quite compliant" in taking her medications. Before the March 31 admission, however, plaintiff had not been taking her medication for several weeks. (Tr. 149)

Dr. Stein observed that plaintiff presented herself as a "verbal and cooperative, intelligent and industrious" person who "has been able to hold gainful employment very well." (Tr. 149) He noted that she had a "well organized and goal directed" pattern of thinking, which was focused primarily on suspicions that her ex-husband was planning to kill her and her daughter. He stated further that her affect, orientation, memory, judgment and insight were fair to good; however, at the time of their session, she still suffered from hallucinations and "significant agitation and depression." (Tr. 147) Finally, Dr. Stein diagnosed her depression as stemming from her paranoid schizophrenia, recommended medication with antipsychotics, and suggested that she be discharged in a "relatively short period of time." (Tr. 147)

On April 7, 1981, Tom Helgeson of the Bureau of Social Security Disability Insurance filed a report summarizing his conversation with Dr. Stein about plaintiff's condition. (Tr. 176–177) The report reiterates much of the aforementioned information regarding plaintiff's psychosis. In addition, the report stated: "Dr. Stein feels that it will be at least one month before Ms. May could return to any work. He added that many people with this disorder are not working at all but that she has put forth much effort to remain in the work force." (Tr. 177)

---

6. "Remission" is defined as "a diminution or abatement of the symptoms of a disease; also, the period during which such diminution occurs." *Id.* at 1343.

7. Stelazine is the trademark name for a major tranquilizer. *Id.* at 1470. Cogentin is the trademark name for a type of nerve-blocking agent. *Id.* at 336.

The next several medical reports, dated March 1981 to May 1982, were prepared as non-psychiatric evaluations of plaintiff's physical condition. They reiterated much of the above summaries of plaintiff's history of psychiatric impairments, but focused primarily on diagnostic testing of her physical impairments. Plaintiff was found to be suffering from mild obesity, musculoskeletal chest pain, and elevated cholesterol. (Tr. 151–159)

On June 16, 1982, plaintiff was admitted to St. Mary's Hospital Medical Center in Madison, Wisconsin; on June 17, W.W. Wood, M.D., filed a detailed report of her psychiatric and physical condition. Plaintiff told Dr. Wood, "The lord is calling for my death." (Tr. 163) She also said that in March or April of 1982, she had begun to experience increased emotional turmoil, including paranoia, fears of being killed, auditory hallucinations, and disturbed sleep. Dr. Wood noted that plaintiff expressed thoughts of religious grandiosity, such as "God has appointed me for special reasons, I know I'm not crazy, it's the truth," and "I also think God told me to run for President."

The report also stated that, despite treatment with increased doses of her usual medication and a new prescription of Mellaril,[8] plaintiff had continued to cope poorly throughout the spring of 1982 and had been hospitalized several times for "crisis intervention." Plaintiff suffered from emotional deterioration, apathy, low energy, agitation, restlessness and fear. (Tr. 163) Dr. Wood observed that plaintiff exhibited a number of the above symptoms at their session, and was also apprehensive and tearful. (Tr. 166) He also concluded, "[I]t is certainly not clear whether she is able to form meaningful relationships." Dr. Wood diagnosed plaintiff's condition as paranoid schizophrenia with "acute exacerbation and with affective features." (Tr.

166) Finally, the report stated that plaintiff had experienced a "breakthrough psychosis in spite of appropriate and therapeutic doses of her usual neuroleptic";[9] accordingly, he prescribed additional antipsychotics, follow-up medical evaluation to determine her physical condition, and continued therapy with plaintiff's psychiatrist (Dr. Stein) and psychiatric social worker (Ms. Holschuh-Peetz). (Tr. 167)

On June 27, 1982, Dr. Wood prepared plaintiff's discharge summary, which elaborated on the circumstances of her June 16 admission to St. Mary's Hospital. Dr. Wood stated: "By the second day of admission, during which time no medications were prescribed, she had become floridly delusional with continued deterioration of her reality testing and judgement." He noted that plaintiff had been treated with a series of antipsychotics, which resulted in excessive sedation without abatement of the underlying psychosis. Finally, both Stelazine and Doxepin[10] were prescribed and plaintiff's condition began to improve. "Improvement was evidenced by increasingly appropriate inner [sic] actions with patients and staff on the Unit, appropriate integration in the Unit activities, a decrease in her paranoid delusions, an improvement in reality testing and judgment, and an overall improvement in her affective disorder." Dr. Wood noted that plaintiff's mental status at the time of discharge was essentially normal, with the exception of the persistent aforementioned delusion about running for President. (Tr. 160) His final diagnoses were paranoid schizophrenia, acute decompensation and atypical depression. (Tr. 161)

On June 18, 1982, D.A. Daugherty, M.D., filed an internal medicine consultation report which described plaintiff's physical health as generally good, "except for her psychiatric problems." (Tr. 168–169) Also on June 18, R.E. Durnin, M.D., reported

---

**8.** Mellaril is the trademark name for a type of strong tranquilizer. *Id.* at 929.

**9.** "Neuroleptic" is defined as "a neuropharmacologic agent that has antipsychotic action affecting principally psychomotor activity, and is gen-

erally without hypnotic effects, as a tranquilizer." *Id.* at 1041.

**10.** Doxepin is the trademark name for a type of antidepressant. *Id.* at 473.

that an examination of plaintiff's chest, heart and lungs revealed no abnormalities. (Tr. 170)

On August 23, 1982, plaintiff was examined by Charles T. Meyer, M.D., a board-certified specialist in psychiatry and neurology to whom she had been referred by the Bureau of Social Security Disability Insurance. According to Dr. Meyer, plaintiff stated that she was having great difficulty in keeping a job because of her paranoid ideations. Plaintiff also felt that her drugs were causing "a lot of havoc." Dr. Meyer then briefly recounted plaintiff's most recent psychiatric difficulties. (Tr. 171) Plaintiff said that in April 1980, her "world fell apart"; Dr. Meyer noted that "she was able to work through April 1982 intermittently, but ... she could not get a breath on the job because she became so anxious, and walked off." (Tr. 171–172) The report continued: "She clearly was suspicious and described significant paranoid thinking. It would appear that this could seriously interfere with a job performance by Mrs. May; she could easily misperceive the motives of others, leading to agitation and anger." (Tr. 172) Dr. Meyer's final diagnosis of plaintiff's condition was chronic paranoid schizophrenia, "with exacerbations again likely." (Tr. 173)

On September 8, 1982, Ms. Holschuh-Peetz filed a report with the Bureau of Social Security Disability Insurance. Ms. Holschuh-Peetz stated: "She [plaintiff] is a woman who has always set goals for herself and who has wanted to be a productive and well-functioning person. Her illness in the past has interfered at times with her goals and her abilities to function. In the past two years, however, it has been even more difficult for her, as her illness has been almost constantly a prominent part of her life. She has been unable to work for any extended period of time and this has been difficult for her to come to terms with and accept. She is not currently able to handle employment and it is not likely she will be able to do so in the near future." (Tr. 174)

Attached to Ms. Holschuh-Peetz's evaluation is a note from Dr. Stein, plaintiff's treating psychiatrist. Dr. Stein stated: "During the florid state of her illness, the patient suffers from delusions of persecution and experiences auditory hallucinations. Following the florid phase (which has been recurring approximately every six months recently), the patient is left with residuals which significantly interfere with interpersonal relationships and her ability to keep a job. In addition, she remains highly preoccupied with bodily functions, is chronically anxious and depressed." Dr. Stein further noted that antidepressants had been tried with little effect. The report concluded: "The most important aspect of the patient's clinical picture is that it has been deteriorating over the past year to the point where she can no longer tolerate the stress of employment." (Tr. 175)

The final report, prepared by Norman M. Clausen, M.D., a medical consultant with the Wisconsin Bureau of Social Security Disability Insurance, summarized a conversation between him and Dr. Stein on November 15, 1982. (Tr. 179–181) According to the report, Dr. Stein stated that plaintiff's condition had in the past been controlled well enough so that she could hold a job, but that she was no longer able to function well enough to work. (Tr. 179) The report continued: "He [Dr. Stein] feels that her current anxiety and fears are due to paranoid ideation with different elements in our society such as political happenings and a variety of organizations, particularly those church-related as she is quite religious. She hears voices and can't identify them.... She will withdraw and have trouble relating to people.... She withdraws not to be heard from for sometime. When this occurs she gets depressed and cries often." (Tr. 179–180) Dr. Stein further noted that plaintiff's personal habits had deteriorated over the past six months and that, given plaintiff's lack of improvement and the nature of her mental disease, there was serious doubt that she would ever be economically independent again. (Tr. 180)

### 3. *Plaintiff's Testimony*

Plaintiff testified that the last time she had held a job "for any length of time" was in August 1980. (Tr. 28) At that time, she was a restaurant manager with supervisory authority over waitresses, busboys, cashiers and hostesses. However, she began to suffer from stress, fatigue and medication side effects, and eventually resigned from her position. (Tr. 28–30) Plaintiff also worked for a McDonald's restaurant, but had to leave that job also when she began suffering from hallucinations and listlessness. (Tr. 30) Plaintiff then began working at a Swiss Colony Restaurant but was fired for missing too much work due to her illness. (Tr. 30–31) Plaintiff's final job was as a cafe waitress; she left that position in April 1982 when she began hallucinating that the restaurant was being gassed. (Tr. 31) Plaintiff no longer sought employment after April 1982. (Tr. 31)

Plaintiff also testified that she had been receiving city welfare benefits since April 1982. She stated that she had had some "good days" and some "bad days": "Sometimes I can go 3 days where it's been real, real rough. Then I'm totally dragged out when I do basically seem like it's going to be a good day. [sic] Then I'm basically dragged out from going through the previous 3 days." (Tr. 32–33)

Plaintiff testified that she had passed the vocational health care course with three absences in eight weeks, and that it had been stressful and very difficult. (Tr. 33) She also stated that she continued to see Dr. Stein about once a month and Ms. Holschuh-Peetz about once a week. (Tr. 34) Plaintiff said that she attended a Bible study group occasionally, but sometimes had trouble getting along with the other students. (Tr. 34) When asked by the ALJ if she tried to pursue other activities, she replied: "Not a lot—not a lot where there's stress involved. I'm—I'm afraid— of becoming too stressful and overtired and I might have another illness again." (Tr. 35)

Plaintiff also testified that, as a waitress, she had had difficulties getting along with co-workers, remembering orders taken from customers, and handling money. (Tr. 36–37) Finally, plaintiff said that she was looking for a low-stress job in case she was denied benefits, but that Dr. Stein and Ms. Holschuh-Peetz had told her she could not work more than two to three hours a day. (Tr. 37–38)

## THE ALJ'S FINDINGS AND DECISION

On September 26, 1983, the ALJ issued her decision. From her evaluation of the evidence of record, the ALJ made the following relevant findings:

(1) The claimant was born on October 1, 1937, and completed the twelfth grade of school and has past relevant work experience as a restaurant waitress.

(2) The claimant met the special earnings requirements for Title II disability insurance benefits on August 25, 1980, the alleged date of disability onset, and continued [will continue] to meet said requirement through December 31, 1985.

(3) The claimant has been diagnosed as having paranoid type schizophrenia.

(4) The claimant has no other significant physical or mental impairment.

(5) Observation of the claimant at the hearing failed to reveal any marked abnormality in mental status or behavior.

(6) The claimant is able to perform her past relevant work experience as a restaurant waitress or, in any case, the routine, repetitive, and low-stress work found in unskilled work which exists in significant numbers in the national economy.

(7) The claimant was not under the "disability" as defined in the Social Security Act, as amended, at any time on or prior to the date of this decision.

(Tr. 15)

In the text of her opinion, the ALJ made the following pertinent finding: "[T]he medical evidence disclosed that, except for the immediately aforementioned occasions,

the claimant has been without evidence of marked restriction in daily activities, marked constriction of interest, marked deterioration in personal habits, or seriously impared [sic] ability to relate to others." (Tr. 14) She also stated that plaintiff's mental status had not been of such severity as to preclude plaintiff's successful completion of vocational rehabilitation in June 1983, indicating that plaintiff did not suffer from a disability. (Tr. 14–15)

## OPINION

### 1. *Standard of Review*

■ Under 42 U.S.C. § 405(g), this court's review of the Secretary's findings is limited to a determination whether those findings are supported by substantial evidence based on the record as a whole. *Whitney v. Schweiker,* 695 F.2d 784, 786 (7th Cir.1982); *Carver v. Harris,* 634 F.2d 363, 364 (7th Cir.1980). Applying this test, the court must uphold the Secretary's determination that plaintiff is not disabled for the purpose of receiving benefits if the findings are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Allen v. Weinberger,* 552 F.2d 781, 784 (7th Cir.1977), *quoting Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). However, where the Secretary's factual determinations are premised on an erroneous view of the applicable law, this court is not bound by that determination. *Schmoll v. Harris,* 636 F.2d 1146, 1150 (7th Cir.1980). Plaintiff here contends both that the ALJ's findings are not supported by substantial evidence, and that the ALJ committed errors of law.

### 2. *Applicable Regulations*

Under 42 U.S.C. § 423(a)(1), a successful claimant for disability insurance benefits is required to be "under a disability." That term is defined in 42 U.S.C. § 423(d)(1)(A) as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

"Physical or mental impairment" is defined in 42 U.S.C. § 423(d)(3) as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Under 42 U.S.C. § 423(d)(5), a claimant "shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(1), (3) and (5) (1978). *See Johnson v. Weinberger,* 525 F.2d 403 (7th Cir.1975).

Pursuant to the Social Security Act, the Secretary has promulgated regulations prescribing a five-step sequential inquiry to be followed in determining whether a claimant is disabled. The following steps are addressed:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment "severe"?

(3) Does the impairment meet or exceed one of a list of specific impairments?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

An affirmative answer to one of the above questions leads either to the next question or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of nondisability. 20 C.F.R. § 404.1520 (1983); *Garfield v. Schweiker,* 732 F.2d 605, 607 (7th Cir.1984).

Specifically, the third step states: "If you have an impairment which meets the durational requirement and is listed in Appendix 1, or we determine that the impairment is equal to one of the listed impairments, we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 1520(d). In this case, the relevant listed impairment is defined in Appendix 1, Section 12.03:

12.03 *Functional psychotic disorders* (mood disorders, schizophrenias, paranoid states). With both A and B:

A. Manifested persistence of one or more of the following clinical signs:

 1. Depression (or elation); or

 2. Agitation; or

 3. Psychomotor disturbances; or

 4. Hallucinations or delusions; or

 5. Autistic or other regressive behavior; or

 6. Inappropriateness of affect; or

 7. Illogical association of ideas;

B. Resulting persistence of marked restriction of daily activities and constriction of interests and seriously impaired ability to relate to other people.

■ Under the Act, a claimant bears the initial burden of proving the existence of a disability. Unless a claimant persuades the Secretary to answer affirmatively to step three in the aforementioned sequential inquiry, thereby requiring a presumption of disability, he or she bears the burden of showing an impairment of sufficient severity to preclude the type of work in which he or she had previously been engaged. Only if the claimant has met this latter test does the burden shift to the Secretary to prove the existence of some other kind of "substantial gainful employment" that the claimant could perform. *Whitney v. Schweiker*, 695 F.2d at 786; *McNeil v. Califano*, 614 F.2d 142 (7th Cir.1980).

### 3. *Issues in present case*

The stated basis for the ALJ's decision in the present case is that plaintiff "is able to perform her past relevant work experience as a restaurant waitress." Thus, the decision was made at step four of the sequential inquiry. The alternative stated basis for the ALJ's decision is that plaintiff "is able to perform ..., in any case, the routine, repetitive, and low-stress work found in unskilled work which exists in significant numbers in the national economy."

Thus, the decision was made, alternatively, at step five. Although it is not explicit in the ALJ's findings, the fact that her decision came at step four or, alternatively, at step five, compels the conclusion she had determined that plaintiff had successfully negotiated steps one and two, but the ALJ had determined, adversely to plaintiff, at step three that plaintiff's disability did not meet or exceed one of the listed impairments in Appendix 1, § 12.03.

Plaintiff contends that the ALJ erred at step three; that the absence of substantial evidence to the contrary compelled a finding that plaintiff's disability meets one of the listed impairments in Appendix 1, § 12.03 and meets the durational requirement of 42 U.S.C. § 423(d)(1)(A) and 20 C.F.R. § 404.1520(d); and that she is entitled, without further inquiry, to a finding of disability and the resulting benefits. Alternatively, plaintiff contends: (a) that if step four must have been reached, the absence of substantial evidence to the contrary compelled a finding that plaintiff is unable to perform her former work as a waitress; and (b) that if step five must have been reached, the absence of substantial evidence to the contrary compelled a finding that plaintiff is unable to perform other work within the economy.

### 4. *Step Three: Listed Impairment*

■ After a brief synopsis of the medical evidence, the ALJ's opinion states: "[T]he medical evidence disclosed that, except for the immediately aforementioned occasions, the claimant has been without evidence of marked restriction in daily activities, marked constriction of interest, marked deterioration in personal habits, or seriously impared [sic] ability to relate to others." (Tr. 14) Apparently, this passage refers to the definition of "functional psychotic disorders" in Appendix 1, § 12.03.[11] However, the ALJ's conclusion is not supported by the evidence of record.

---

**11.** The section actually requires "persistence of marked restriction of daily activities and construction of interests and seriously impaired ability to relate to other people" Appendix 1, § 12.03(B). "[D]eterioration of personal habits (including personal hygiene)" is among the issues to which clinical findings are considered relevant. Appendix 1, § 12.00(A).

Plaintiff submitted extensive evidence concerning her psychiatric condition during the alleged period of disability. These medical reports, particularly those of Dr. Rusch, Dr. Stein, Dr. Wood and Dr. Meyer, describe plaintiff as a woman severely debilitated by chronic paranoid schizophrenia. They contain ample documentation of the clinical manifestations of plaintiff's disorder. In fact, several reports directly contradict the ALJ's findings regarding the severity of plaintiff's impairment.[12] Significantly, even Dr. Meyer, the psychiatrist to whom plaintiff was referred by the Bureau of Social Security Disability Insurance, corroborated the seriousness of her condition and noted that "exacerbations were again likely." (Tr. 173)

■■■ The ALJ accorded little, if any, weight to the medical reports and opinions of plaintiff's treating psychiatrist and psychiatric social worker, who had been familiar with her condition since 1975. While the opinion of a treating physician is not determinative of a claimant's disability, an ALJ is not entitled to ignore it without good reason. "If the ALJ concludes that a treating physician's evidence is credible ... he should give it controlling weight in the absence of evidence to the contrary because of the treating physician's greater familiarity with the plaintiff's conditions and circumstances." *Whitney v. Schweiker*,. 695 F.2d at 789; *Carter v. Schweiker*, 535 F.Supp. 195, 203–204 (S.D.Ill.1982). *See also Carver v: Harris*, 634 F.2d 363, 364 (7th Cir.1980); *Allen v. Weinberger*, 552 F.2d 781, 785–786 (7th Cir.1977). Here, the ALJ made no finding regarding the credibility or lack of credibility of the treating physician's assessments. (Tr. 14) Accordingly, the ALJ erred in assigning Dr. Stein's medical opinions little or no weight.[13]

■■■ The ALJ's opinion noted that at the hearing, plaintiff revealed "no marked abnormality in mental status and behavior." (Tr. 15) It is well settled that an ALJ is entitled to rely on personal observa-

---

**12.** The Secretary's brief quotes very selectively from these reports to support the contention that plaintiff's condition was not of disabling severity. This approach is flawed in several respects. First, in sifting through medical reports solely for "positive" assessments of plaintiff's capabilities, the Secretary ignores the overall negativity of these reports; such selective interpretation does not constitute "substantial evidence" of nondisability.

Second, the Secretary's brief, as well as the ALJ's opinion, fails to take into account the progressive deterioration of plaintiff's condition as revealed by the medical evidence as a whole. Plaintiff's disorder emerges as one of gradual debilitation; therefore, it is entirely consistent for earlier reports to contain more "positive" prognoses than later reports.

Finally, the Secretary's brief suggests that evidence of relatively symptom-free periods in plaintiff's life is persuasive proof of nondisability. However, particularly in claims involving mental disorders, symptom-free intervals do not compel a finding of nondisability. "Unlike a physical impairment, it is extremely difficult to predict the course of mental illness. Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse." *Lebus v. Harris*, 526 F.Supp. 56, 61 (N.D.Cal.1981). The record shows that the examining physicians took these considerations into account in their evaluations of plaintiff's condition. It is obvious from the ALJ's decision and the Secretary's brief that the ALJ and the Appeals Council did not.

**13.** The Secretary's brief contends that the ALJ properly accorded little weight to these medical opinions because they were "unsupported by specific clinical findings." There is no basis for this assertion. According to Appendix 1, § 12.-00(A), clinical signs are "medically demonstrable phenomena ... which indicate specific abnormalities of behavior, affect, thought, memory, orientation, or contact with reality," and clinical findings are those "relevant to such issues as restriction of daily activities, constriction of interests, deterioration of personal habits (including personal hygiene), and impaired ability to relate to others." The medical evidence of record, particularly the reports submitted by Dr. Stein, directly addressed these requirements.

The ALJ's cursory opinion and the Secretary's brief fail to honor well-accepted diagnostic techniques and methodology of the psychiatric profession. "Courts have recognized that a psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as is a medical impairment and that consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine." *Lebus v. Harris*, 526 F.Supp. at 60. *See Lewis v. Weinberger*, 541 F.2d 417, 420 (4th Cir.1976).

tions during a hearing concerning the severity of a claimant's pain; such credibility determinations may even be given considerable weight. *Whitney v. Schweiker*, 695 F.2d at 788; *Bibbs v. Secretary of Health, Education and Welfare*, 626 F.2d 526, 528 (7th Cir.1980). However, it is also clear that an ALJ must consider all the evidence and not ignore that which suggests a contrary conclusion. *Whitney v. Schweiker*, 695 F.2d at 788; *Garcia v. Califano*, 463 F.Supp. 1098, 1105 (N.D.Ill.1979). Given the substantial evidence supporting plaintiff's disability claim in this case, the ALJ erred in giving her personal observations controlling weight.

Finally, the ALJ's opinion suggested that plaintiff's completion of a vocational course in June 1983 was indicative of nondisability. (Tr. 14–15) Certainly, this evidence was entitled to consideration. However, plaintiff's testimony also revealed that she encountered considerable difficulty simply in completing the eight-week course.

In short, despite the allocation of the burden of persuasion on step three to plaintiff, there was not substantial evidence to support a finding of an absence of manifested persistence of depression, agitation, hallucinations and delusions, inappropriateness of affect, and illogical association of ideas, within the meaning of § 12.03 A, or to support a finding of an absence of resulting persistence of marked restriction of daily activities, constriction of interests, and seriously impaired ability to relate to other people, within the meaning of § 12.03 B. A finding of the existence of a functional psychotic disorder (schizophrenia and paranoid states), within the meaning of § 12.03, was compelled. An affirmative answer to the question embodied in step three was compelled, and there was no occasion to reach steps four or five.

5. *Step Four: Ability to Return to Former Work*

■ I will assume, however, that there is substantial evidence to support the ALJ's implicit finding, at step three, that there was an absence of a functional psychotic disorder, within the meaning of § 12.03. For reasons appearing in my discussion of step three, and bearing in mind that the burden of persuasion as to step four rests with the plaintiff, there is no substantial evidence to support the ALJ's finding that plaintiff was capable of returning to her former work as a waitress. The medical reports specifically addressing this question emphatically reach the contrary conclusion. Therefore, the ALJ was compelled to find the plaintiff was unable to perform her former work, and the ALJ was compelled to proceed to step five.

6. *Step Five: Ability to Hold Other Substantial Gainful Employment*

Step five is reached only when step four has been answered in plaintiff's favor, and, as to step five, the burden of persuasion is allocated to the defendant Secretary.

Regulations (embodying what are known as the "grids") have been promulgated in an effort to regularize the Secretary's decision-making at step five. 20 C.F.R. § 404.-1569, Appendix 2. When the impairment is wholly exertional, "the correct disability decision" is to be found in the grid. Appendix 2, § 200.00(d). When the impairment is nonexertional: "determination as to whether disability exists shall be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in this Appendix 2. The rules do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional types of impairments." Appendix 2, § 200.00(e)(1).

Plaintiff's impairment is wholly nonexertional. The grids are not considered to provide the correct disability decision, although consideration should be given them. *Id.*

The ALJ found that plaintiff "is able to perform ... the routine, repetitive, and low-stress work found in unskilled work which exists in significant numbers in the national economy." The decision contains no explanation for this finding which is directed to an equation between plaintiff's

residual functional capacity, age, education, and past work experience, on the one hand, and the demands of certain kinds of substantial gainful work which exists in the national economy, on the other hand. Nothing in the ALJ's decision reveals that the finding springs from a conscious effort to seek guidance in the grids, as to either side of the equation.

It is true, of course, that as a result of a generalized exercise of judicial notice, the grids embody findings that approximately 200 separate unskilled sedentary occupations, 1600 separate sedentary and light unskilled occupations, and 2500 separate sedentary, light and medium unskilled occupations can be identified, each representing numerous jobs in the national economy. Appendix 2, §§ 201.00(a), 202.00(a), 203.-00(a). It is also true that plaintiff's age, education, and past work experience were established in the administrative record, and that the record included considerable information bearing on the nature and extent of plaintiff's residual functional capacity.

Even if we were to assume that the ALJ had correctly assessed that residual functional capacity, however, there is a missing link: namely, an informed comparison of the specific components of plaintiff's vocational capacity with the specific demands of specific jobs. Because the grids are unavailable to supply that missing link in cases of nonexertional impairment, it must be supplied from a source other than an ALJ's intuition. In functional psychotic disorders, subtleties abound, many of which may be highly relevant to the specific demands of specific jobs.

 It has been held that when exertional impairments are combined with nonexertional impairments which further limit the range of jobs available to a claimant, and the grids do not apply conclusively, "the Secretary must produce a vocational expert to testify that the particular claimant retains the ability to perform specific

jobs which exist in the national economy." *Grant v. Schweiker,* 699 F.2d 189, 192 (4th Cir.1983). *See Taylor v. Weinberger,* 512 F.2d 664, 668 (4th Cir.1975). *See also, 20 C.F.R. § 1566(e).* It is unnecessary to adopt so broad a rule in the present case. As I have said, the nature of this plaintiff's impairment is such that its vocational implications are not readily discernible.[14] In such a case, a decision by an ALJ cannot be reasonably informed without testimony from a vocational expert or guidance from some written source equivalent to such testimony. Expert testimony was not produced here. So far as appears, no equivalent source of guidance was sought out.

I conclude that there is no substantial evidence to support a finding that plaintiff is able to engage in substantial gainful activity, other than her previous work, which exists in the national economy.

The only real question is whether reversal or remand is appropriate on this aspect of the case. In light of my decision on step three, remand is inappropriate. Steps four and five are being addressed by me, alternatively, only because each of them was relied upon by the ALJ, independently of the other, as a basis for a determination of no disability. The manner in which the ALJ adverted to step five is casual, as is her failure to seek out information relevant to the inquiry.

### ORDER

It is ordered that:

(1) plaintiff's request for reversal of the Secretary's decision is granted;

(2) defendant's request for affirmance of the Secretary's decision is denied;

(3) plaintiff's request for attorney's fees pursuant to 42 U.S.C. § 405, and costs pursuant to 28 U.S.C. § 2412(a), is granted;

(4) this action is remanded with the direction that the claim of plaintiff be allowed as of August 25, 1980; and

---

**14.** Why, for example, the ALJ implicitly decided that only unskilled work would be appropriate for plaintiff, without inquiry into transferability of skills or capacity to acquire them, is unexplained and unclear.

(5) the clerk of court enter judgment providing that: (a) this action is remanded to defendant with the direction that the claim of plaintiff be allowed as of August 25, 1980, (b) attorney's fees are awarded to plaintiff pursuant to 42 U.S.C. § 405, and costs are awarded to plaintiff pursuant to 28 U.S.C. § 2412(a).

